## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

Tiffany Fletcher,

        Plaintiff,

    -Against-

Firstmark Services, Nelnet Inc.,
and Credit Control, LLC,

        Defendants.
_____

Civil Action No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

### PRELIMINARY STATEMENT

1.    Plaintiff Tiffany Fletcher is a student loan borrower who has been harassed by Defendants who seek to collect four private student loans.   Despite asking four times orally and three times in writing that Defendants not call her on her cell phone, all three Defendants made at least 77 calls to Plaintiff's cell phone in violation of the Telephone Consumer Protection Act, (hereinafter "TCPA"), 47 U.S.C. § 227 *et seq.*

2.    After Ms. Fletcher stopped answering Defendant Firstmark's incessant calls, Defendant Firstmark retaliated.   Defendant Firstmark called Plaintiff's

1

brother feigning it had lost contact with Ms. Fletcher, and humiliated her by telling her brother that the call was about a student loan and that Ms. Fletcher should call them back since they had been having trouble reaching her.

3.     After Firstmark received Ms. Fletcher's certified letter demanding that it stop calling her cell phone, Defendant Firstmark's parent company, Defendant Nelnet sought to evade the no-call letter by calling Ms. Fletcher's cell phone from a Nelnet auto dialer.

4.     Defendant Credit Control likewise violated the TCPA by making eight of the 77calls to Ms. Fletcher's cell phone without her consent.

5.     Plaintiff seeks actual and statutory damages under the TCPA.   Plaintiff also seeks damages and injunctive relief under New York General Business Law § 349 due to Defendant Firstmark's and Defendant Nelnet's deceptive conduct.

## JURISDICTION

6.     This Court has subject matter jurisdiction over the TCPA action under 28 U.S.C. §1331, and over the New York deceptive practices action under 28 U.S.C. § 1367 which provides supplemental jurisdiction for state claims.

## VENUE

7.     Venue is proper in the Southern District of New York pursuant to 28

U.S.C. § 1391(b) inasmuch as a substantial portion of the unlawful practices giving rise to the claims herein occurred within the Southern District of New York.

## PARTIES

8.     Tiffany Fletcher ("Ms. Fletcher") is an adult who lives at 765 Riverside Drive, #3F, New York, NY 10032.

9.     Defendant Firstmark Services is the servicer of Ms. Fletcher's student loans which Defendants were attempting to collect when they engaged in the conduct described in this action.   Firstmark is headquartered at 121 South 13th Street, Suite 100, Lincoln, Nebraska 68508.

10.     Defendant Nelnet, Inc. is the parent company that owns Defendant Firstmark Services and is headquartered at 121 South 13th Street, Suite 201, Lincoln, Nebraska 68508.

11.     Defendant Credit Control, Inc., is the debt collection agency retained by Firstmark to collect one of Ms. Fletcher's student loans.   Credit Control, Inc., is located at 5757 Phantom Drive, Suite 330, Hazelwood, Missouri, 63042.

## STATUTORY FRAMEWORK

12.     The Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 et Seq. and its implementing regulation 47 C.F.R. § 64.1200 broadly prohibits any person from placing calls using an automated telephone dialing system or artificial

or prerecorded voice to a cellular phone without prior consent of the recipient.

13.     A "called party may revoke consent at any time and through any reasonable means"—orally or in writing—"that clearly expresses a desire not to receive further messages." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (2015 Declaratory Ruling), 30 FCC Rcd. 7961, 7989-90 ¶ 47and 7996 ¶ 63. (2015).

14.     The term "automatic telephone dialing system" means equipment which has the capacity: a) to store or produce telephone numbers to be called, using a random or sequential number generator; and b) to dial such numbers. 47 U.S.C. § 227(a)(1).

15.     Debt collectors and student loan servicers use autodialers to call borrowers when a live agent is available to speak to the borrower.

16.     Some autodialers use pre-recorded messages asking the recipient to press 1 if they want to speak with an agent.

17.     Other autodialers are characterized by dead air or clicking sounds or pauses between the time the recipient of the call picks up the phone and the time the agent comes on the line.

18.     Congress enacted the TCPA because unwanted calls are a nuisance and invasion of privacy. Pub. L. 102–243, § 2, ¶¶ 5–6, 9–10, 13–14, 105 Stat. 2394

(1991).

19.     Unwanted calls violate the TCPA even if unanswered because they invade a consumer's privacy and/or waste a consumer's time.

20.     The penalty for each TCPA violation is the "actual monetary loss" of the person receiving the call, or $500.00 in damages, whichever is greater. 47 U.S.C.A. § 227(b)(3)(B).

21.     A court may treble the damage award to $1,500.00 for each unwanted call if it finds that the defendant's TCPA violation was "willful or knowing." 47 U.S.C. § 227(b)(3).

22.     Evidence of a "willful or knowing" violation includes the defendant making the call after the consumer revokes her consent or tells the defendant to stop calling.

## STATEMENT OF FACTS

23.     Tiffany Fletcher grew up in a working-class family in Harlem.   She earned an undergraduate degree at an Ivy League university.   Much of her undergraduate tuition was paid for by federal Pell grants and tuition discounts from the university.

24.     In 2006, she enrolled in graduate school in New York City.   Graduate school was expensive.   Between 2006 and 2008, she borrowed six private student

loans issued by non-defendant Citibank, in addition to federal loans, to finance her graduate school education.

25.     At the time she took out these loans, she lived at the same address she lives at today, 765 Riverside Drive, #3F, New York, NY 10032.   However, when the loans were originated about a decade ago, she did not use the cell phone number which ends xxx-xxx-8800 because she had not yet acquired that number.

26.     From 2009 to 2012, she stayed current on her Citibank student loans through payments, and, during financial hardships, by electing to use her contractually permitted forbearances.

27.     On information and belief, Ms. Fletcher usually paid about $441 a month toward her six Citibank loans between 2009 and 2012.   On information and belief, during this time she also paid a portion of her income towards her federal loans under an income driven repayment plan.

28.     In 2012, two of the six Citibank loans were sold to Discover Bank.

29.     By 2012, Ms. Fletcher did not use a landline phone number but instead relied exclusively on her cell phone ending in 8800 for all communications.

30.     From 2012 onward, Ms. Fletcher paid $333.41 monthly to Citibank on the four loans Citibank held, and over $100 a month to Discover on the remaining two loans.

31.     In 2015, Ms. Fletcher fell and injured her wrist for which she eventually received surgery.   The wrist injury, surgery, and extensive recovery prevented her from working.   However, in 2015 and 2016 Ms. Fletcher had some savings, including a retirement account, from which she drew funds to remain current on her monthly student loan payments to Citibank and Discover. Because she was unemployed, her federal student loan payments were $0.00.

32.     By early 2017, Ms. Fletcher had exhausted her savings and had even sold some of her jewelry to remain current on her loans.   She remained out of work due to her disability and relied on friends and family for rent and basic needs.

33.     In early 2017, Ms. Fletcher called Discover and Citibank on her cell phone and explained her financial situation and asked for a forbearance or some other arrangement regarding her private loans.

34.     Discover offered her a forbearance and then an interest only payment of $56 a month, which Ms. Fletcher accepted.   Citibank could not provide Ms. Fletcher a forbearance because she had exhausted them already.

35.     On information and belief, during her phone call to Citibank, Ms. Fletcher provided or confirmed the accuracy of her cell phone number ending in 8800 to the Citibank employee.

36.     On or about March 28, 2017, Ms. Fletcher missed her monthly payment

7

of $163.17 on one of her four Citibank loan.   By the time she missed this payment, she had already paid close to $20,000 in interest and principal towards the four Citibank loans.

37.    On March 30, 2017, non-defendant Citibank sent a letter to Ms. Fletcher stating that her four loans would be serviced by Firstmark, a subsidiary of Nelnet, effective April 24, 2017.

38.    On April 4, 10 and 15, 2017, Ms. Fletcher spoke with non-defendant Citibank on her cell phone renewing her request for a forbearance in light of her injury, unemployment, good payment history, and lack of savings or family with deep-pockets. Citibank reiterated that it could not offer her any more forbearances but suggested that the new servicer, Firstmark, might be able to help her.

39.    Sometime in the weeks after March 30, 2017, Ms. Fletcher registered herself on Defendant Firstmark's webpage for on-line access to the accounts Firstmark serviced.

40.    On information and belief, Ms. Fletcher gave her cell phone number ending in 8800 to Defendant Firstmark when registering on line.

41.    On information and belief, Ms. Fletcher told Defendant Firstmark that the number was to her cell phone.

42.    On April 24, 2017, Ms. Fletcher consulted with a legal services

8

lawyer regarding non-defendant Citibank's unwillingness to provide her with a forbearance.

43.    On April 25, 2017 and April 26, 2017, Defendant Firstmark called Ms. Fletcher on her cell phone ending in 8800.   The originating number was 844-627-1504 and the calls lasted one and two minutes respectively.   Ms. Fletcher does not recall specifically what was said during these first two calls.

44.    On information and belief, these first two calls were identical to all the subsequent calls Defendants Firstmark, Nelnet and Credit Control made which are the subject of this action: no one was immediately on the line when she answered "hello."

45.    On some of these calls, there would be just clicking sounds, or the sound of someone breathing or typing, but no agent, after which Ms. Fletcher would hang up.

46.    On other calls, there would be a pause of few seconds after she said hello, followed by an agent who would quickly identify him or herself and then ask "a.m. I speaking to [pause] Tiffany Fletcher?"

47.    On other calls, there sometimes was a pre-recorded message announcing "this is Firstmark calling about an important message about your account" and directing Ms. Fletcher to press 1 to speak with an agent.

48.     On information and belief, Nelnet and Credit Control also used pre-recorded messages when calling Ms. Fletcher's cell phone.

49.     Because the last Citibank agent told Ms. Fletcher that Firstmark might offer a repayment plan or forbearance that Citibank could not, Ms. Fletcher called Firstmark at 844-627-1504 on April 27, 2017.   She spoke four times with Firstmark that day. The four calls lasted 6, 19, 7 and less than 2 minutes respectively.

50.     On each call except the last, Ms. Fletcher explained that she was not working following a serious wrist injury, that her savings were depleted, and that she was unable to continue paying her private loans.   Firstmark responded by asking how she planned to rectify the situation and whether friends or family could help. Ms. Fletcher in turn asked Firstmark for a forbearance or hardship deferment. Firstmark responded that she had used up all of the forbearances that Citibank provided.

51.     On April 28, 2017, Firstmark sent Ms. Fletcher an email stating her payment was past due, but there might be payment relief available to her.

52.     Unsure whether Firstmark was backtracking on its previous position, Ms. Fletcher called Firstmark at 844-627-1504 on April 28, 2017.   She had an 11 minute conversation with yet another Firstmark employee during which she explained her personal plight and good payment history.   The representative

responded that Citibank made the rules and they could offer no more forbearances.

53.     Despite saying there was nothing it could do, Firstmark continued to make regular calls at least every other day to Ms. Fletcher on her cell phone, who by now recognized Firstmark's number. (844-627-1504). Because Ms. Fletcher was still unemployed without any means of repaying the loan, Ms. Fletcher stopped answering Firstmark's calls.

54.     The frequent calls, even though unanswered, deeply affected Ms. Fletcher. She had explained her good payment history, recent disability and unemployment, and lack of family and friends with large incomes or savings who might be able to help her with her loans. Firstmark's frequent calls thereafter made Ms. Fletcher feel that Citibank and Firstmark did not believe her.

55.     On May 3, 2017, at 2:05 p.m., Ms. Fletcher answered a call from Firstmark from 844-627-1504.   The call was two minutes long.   On information and belief, the call was originated from an automatic telephone dialing system. Ms. Fletcher told Firstmark her situation had not changed and to stop calling.

56.     This unequivocal statement to "stop calling" constituted a rescission of any consent Ms. Fletcher may have provided Firstmark earlier to call her cell phone using an autodialing device.

57.     On May 4, 2017, Ms. Fletcher conferred with a legal service attorney

about the intrusive calls and her inability to get a forbearance.

58.     That same day, Ms. Fletcher through her attorney filed complaints against Firstmark and Citibank with the Consumer Financial Protection Bureau.

59.     The two complaints were filed on CFPB's internet platform under the problem headings "communication tactics" and "frequent or repeated calls."

60.     Thereafter, Ms. Fletcher kept a call log of all communications by anyone related to her student loan debt.

61.     Citibank responded to the CFPB complaint on May 5, 2018, stating that the complaint did not involve Citibank conduct since Citibank was not the one calling Ms. Fletcher.   Citibank directed Ms. Fletcher to address the issue directly to Firstmark.

62.     On May 8, 2017, at 1:17 p.m. Ms. Fletcher answered a call to her cell phone from Firstmark (844-627-1504) but only heard breathing and typing on the phone. She hung up without talking to anyone. She then called the number that was listed as dialing her cell phone and heard a recorded message "Welcome to Firstmark."

63.     On May 9, 2017, Firstmark called Ms. Fletcher three times on her cell phone from 844-627-1504 at 12:28 pm, 2:17 pm, and 3:54 p.m. Ms. Fletcher did not answer these calls.

64.     On May 10, 2017, Firstmark called Ms. Fletcher three times on her cell phone from 844-627-1504 at 1:31 pm, 3:49 pm, and 5:34 p.m.

65.     Ms. Fletcher did not answer the first two calls on May 10, 2017. Upset by the relentless and intrusive calling, Ms. Fletcher did answer the third call, repeating "hello" over and over.   No one on the other end picked up the call.   Ms. Fletcher hung up without talking to anyone.

66.     On May 11, 2017, the CFPB forwarded Ms. Fletcher's complaint to Firstmark.

67.     On May 11, 2017, Firstmark called Ms. Fletcher twice on her cell phone from 844-627-1504 at 12:17 p.m. and 5:54 p.m.   Ms. Fletcher answered the first call, but no one at Firstmark answered despite her repeated statements of "hello."   Ms. Fletcher hung up.

68.     Ms. Fletcher also answered the second Firstmark call.   As was typical in the calls she received from Firstmark, Ms. Fletcher experienced a long pause of several seconds from the time she said hello.   However, this time, after a several second delay, a Firstmark operator, a man named Kevin, came on the line.

69.     On information and belief, during the May 11, 2017 call, Kevin made a series of statements followed by a series of questions that were typical of the scripts Firstmark agents used.

70.     On information and belief, Kevin verified Ms. Fletcher's mailing address and phone number.   He then stated the full amount she owed, that she was delinquent by a certain number of days and owed a certain amount of money that must be paid to bring the loan current.   He then asked if she could make such a payment.

71.     Ms. Fletcher interrupted Kevin and stated to him that her situation had not changed since she last spoke with Firstmark eight days earlier. She stated that if she paid her student loans, she would not be able to pay her rent and buy food.   She also said that she had paid her loans when employed and healthy, and would do so in the future when she returned to work. For a second time in eight days, Ms. Fletcher asked Firstmark to stop calling her after which she hung up.

72.     Although Ms. Fletcher had once in writing and twice orally rescinded permission for Firstmark to call her on her cell phone, Firstmark continued to call Ms. Fletcher.

73.     On May 12, 2017, Firstmark called Ms. Fletcher' cell phone twice from 844-627-1504.   Ms. Fletcher picked up the second call at 4:53 p.m. and, after the agent came on the line, asked in exasperation why Firstmark was calling every day when her situation had not changed.   Ms. Fletcher made clear for the fourth time in nine days that she did not want to receive any more calls from Firstmark. The

14

Firstmark agent stated that she would continue to receive calls until the "issues" with her account were "resolved." He further stated she could ignore the calls if she wished, but the calls would continue.

74.     On May 15, 2017, Firstmark called Ms. Fletcher three times at 12:23 p.m., 1:59 p.m., and 3:02 p.m. from 844-627-1504.   Ms. Fletcher did not answer the calls.

75.     On May 16, 2017, Firstmark called twice in the evening at 6:44 p.m. and 8:00 p.m. from 844-627-1504.   Although she did not answer the calls, they unsettled Ms. Fletcher since Firstmark had never called so late in the day.

76.     On May 18, 2017, Firstmark called three times at 2:50 p.m., 3:52 p.m. and 5:30 p.m. from 844-627-1504.   Ms. Fletcher did not answer the calls.

77.     On May 19, 2017, Firstmark called four times at 1:04 p.m., 2:17p.m., 3:44 p.m. and 4:52 p.m. from 844-627-1504.   Ms. Fletcher did not answer these calls.

78.     On May 23, 2017, Firstmark reported to the CFPB that it was closing the CFPB complaint because Ms. Fletcher's attorney had filed the complaint, and it had not received an authorization from Ms. Fletcher to investigate the matter.

79.     On May 30, 2017, Firstmark called Mr. Fletcher from a new number 888-538-7378.   Ms. Fletcher answered and had to wait a few seconds before the

15

Firstmark employee came on the line.   The employee said her loan was 63 days

overdue and that she needed to make an $828.31 payment.   Ms. Fletcher explained

her situation including that she could not make any payment. The Firstmark

employee then asked Ms. Fletcher if she could make a $160 payment that day.

Upset, Ms. Fletcher asked the employee if he had been listening to what she had just

told him about her finances.   Ms. Fletcher then hung-up the phone.

80.     Unable to stop the calls despite her oral request and her attorney's

complaint to the CFPB, Ms. Fletcher refiled her complaint against Firstmark in her

own name with the CFPB on June 1, 2017.   In addition, Ms. Fletcher filed an

identical complaint against Firstmark with the New York State Department of

Financial Services.

81.     Ms. Fletcher complained to the two regulators that Firstmark was

calling "relentlessly" despite her repeated explanations that she remained disabled,

unemployed, and lacked assets from which to make a payment.   Ms. Fletcher asked

that Firstmark "stop calling" under the complaint's heading "what would be a fair

resolution to this issue."

82.     On June 2, 2017, Firstmark responded to the CFPB complaint stating

"unfortunately, we are unable to stop these calls . . . even though we are aware of

your financial situation. . . . You may continue to receive . . . calls as long as the

account is past due."

83.     On June 23, 2017, Firstmark responded similarly to the New York DFS complaint.

84.     Despite Firstmark's position that it would continue to call Ms. Fletcher, it stopped calling her between May 31, 2017 and July 6, 2017.

85.     Firstmark began calling again on July 7, 2017.   From July 7 to July 13, 2017, Firstmark called six times. Five of these calls were from 844-627-1504, while one, on July 10, 2017, was from 888-538-7378.

86.     Ms. Fletcher did not answer the calls because her financial situation had not changed and she knew Firstmark's operators would not offer her a forbearance. Nevertheless, each unanswered call, generated unpleasant feelings of anger and depression.

87.     On July 13, 2017, a representative for Firstmark called Ms. Fletcher's brother and advised him that he worked for Citibank and had been unable to reach Ms. Fletcher on a matter related to a student account.   The Firstmark representative asked Ms. Fletcher's brother to tell Ms. Fletcher to call Firstmark, and provided its number, 888-538-7378.   Ms. Fletcher's brother emailed the details of this call to Ms. Fletcher that evening.   He asked her if she knew "anything about" a student account problem.

88.     Ms. Fletcher was deeply upset by Firstmark's call to her brother. She was embarrassed that her brother had learned about her student loan problem. She worried that Firstmark was calling other family members, friends or former work colleagues regarding her student loan debt. She worried that such persons that Firstmark contacted would think badly of her. She felt that Firstmark was publicly shaming her for failing to repay her debt, even though it stemmed from her inability to work due to her disability.

89.     Ms. Fletcher felt hopeless after her brother was contacted.   If she answered Firstmark's calls, there was nothing she could say to get a forbearance. Instead, answering the calls would likely result in her retelling her very personal story to an unresponsive stranger, which would make her feel angry or embarrassed. If she answered the call, Firstmark's agent was likely to ask why her friends and family could not help and how she planned to remedy the problem – fruitless conversations that she had recently had with other agents.

90.     However, Ms. Fletcher also feared that if she ignored the calls, Firstmark would ramp-up its public shaming campaign and call other friends, family and acquaintances. And she felt that there was nothing she could do to stop the calls, given that when asked to stop, representatives from Firstmark had repeatedly told her that they would not stop while her account was past due.

91.    Thereafter, Firstmark called Ms. Fletcher six more times on July 14 at

8:10 a.m., July 17 at 8:35 a.m., July 18 at 10:12 a.m., July 19, 2017 at 8:31 a.m.; July

20 at 8:53 a.m., and July 21, 2017 at 10:46 a.m.   Ms. Fletcher did not answer any of

these calls.   All of these calls originated from 844-627-1504, except the last one

which originated from 844-213-1492.

92.    Each call rekindled Ms. Fletcher's worries that Firstmark was

contacting friends, families and professional colleagues.   Each call put her in a bad

mood, increased a sense of foreboding, and diminished her ability to concentrate.

Each call caused her to ruminate on her decline from a self-reliant professional who

responsibly paid her student loans, to a person side-lined from work due to a

disability.

93.    On July 21, 2017, Firstmark made a second call that day at 3:34 p.m.

from 888-538-7378.   Ms. Fletcher answered this call and spoke with a man named

Steve.   Ms. Fletcher angrily told Steve that she had learned that Firstmark had

called other people about the debt even though it had her number.   Steve did not

address this issue but instead insisted that she make a payment.   Ms. Fletcher told

Steve that her situation had not changed, that she could not make a payment, and that

there was nothing further to discuss.   Steve responded again by demanding

payment and Ms. Fletcher hung up.   Steve immediately called Ms. Fletcher back

from 888-538-7378 at 3:37 p.m. and again at 3:44 at which time Steve left a

voicemail stating "July 28 is the deadline for taking care of this; after that, the loans

will be transferred out [referred to a collector]." This was followed by the

Firstmark's fifth call of the day at 4:51p.m., which Ms. Fletcher did not answer. The

fifth call was from 844-213-1492.

94.     On or about July 22, 2017, Ms. Fletcher sent a certified letter return

receipt requested to Firstmark in which she cited the Telephone Communication

Protection Act and told Firstmark to stop calling her.

95.     Firstmark called Ms. Fletcher twice on July 22, 2017 at 8:21 a.m.

and 11:29 a.m., and twice on July 24 at 10:36 a.m. and 3:40 p.m.    Ms. Fletcher

did not answer these calls, the first three of which originated from 844-213-1492

and the last one of which originated from 844-627-1504.

96.     On July 25, 2017, Firstmark acknowledged receipt of the July 22, 2017

cease and desist letter by signing the "return receipt" green postcard attached to the

certified letter.

97.     On July 25, 2017, Defendant Nelnet, the parent company of Firstmark,

originated a call from 888-486-4722 at 10:31 a.m. which Ms. Fletcher did not

answer.    Firstmark also called at 1:02 p.m. from 888-538-7378 which Ms.

Fletcher did not answer.

98.    On information and belief, Nelnet started calling in an attempt to evade compliance with Ms. Fletcher's cease and desist letter.

99.    On July 26, 2017 at 9:40 a.m., Ms. Fletcher answered a call originated from Nelnet at 888-486-4722. No one picked up when Ms. Fletcher said "hello," an indicator that Nelnet was using an auto dialer.    Ms. Fletcher called back this number since she thought it might be of importance since the caller had called twice in two days. The call went to a message "Welcome to Nelnet." She hung up.

100.    At 12:17 p.m. on July 26, 2017, Firstmark called from 888-538-7378. Ms. Fletcher advised the operator, who identified himself as Steve, that she had sent Firstmark a cease and desist letter. Steve acknowledged that Firstmark had received the letter.    He then launched into his script, telling her that her loan was delinquent. Ms. Fletcher hung up.

101.    At 9:28 a.m. on July 27, 2017 Nelnet called from 888-486-4722. Ms. Fletcher advised the operator, Jerry, of the cease and desist letter. Jerry confirmed that Firstmark had received the letter, but said "it doesn't look like it's been processed."    After Ms. Fletcher complained that the operator yesterday had noted receipt of the letter, and still she was receiving calls, Jerry said "I'll note the account." This call lasted two minutes.

102.    At 10:00 a.m. on July 28, 2017, Firstmark called from 844-213-1492

but Ms. Fletcher did not answer.

103.   At 2:06 p.m. on July 31, 2017, Firstmark called Ms. Fletcher from 844-213-1492.   This time, Ms. Fletcher recorded the call.

104.   The recording reveals that when Ms. Fletcher picked up, a prerecorded message said "Hello, this is Firstmark Services calling in regard to your account. We have important information to share with you. If you would like to speak with an agent, press 1."

105.   Ms. Fletcher pressed 1, and seven seconds later, an agent came on the phone.

106.   The agent said: "Thank you for holding, this is Dan with Firstmark Services, am I speaking to [two second pause] Tiffany Fletcher?"

107.   Ms. Fletcher said yes and then immediately advised the agent that she was recording the call.   Ms. Fletcher told the agent about the cease and desist letter that Firstmark had already received. The Firstmark agent put Ms. Fletcher on hold for 3 and ½ minutes and then stated that Firstmark had not "updated its system" regarding her cease and desist letter and that he would advise "leadership" about this omission. The call lasted five and one half minutes.

108.   On August 1, 2017, Firstmark called from 844-213-1492 at 1:17 p.m. Ms. Fletcher did not answer the call.

109.   Between August 2, 2017 and August 17, 2017, the parent company of Firstmark, Nelnet, called from 888-486-4722 seven times despite its knowledge of the cease and desist letter. The calls were at: 10:25 a.m. on August 2; 3:01 p.m. on August 3; 9:27 a.m. on August 7; 1:47 p.m. on August 11; 2:24 p.m. on August 14; 4:25 p.m. on August 16; and 9:47 a.m. on August 17.

110.   Ms. Fletcher did not answer these calls.

111.   On August 17, 2017, Firstmark responded to Ms. Fletcher's June 1, 2017 complaint to the New York State Department of Financial Services in which she asked Firstmark to stop calling.   Firstmark stated that she "may continue to receive . . . calls as long as the account reflects past due."

112.   On or about August 17, 2017, Firstmark transferred one of her debts to a collector, Defendant Credit Control LLC.

113.   Credit Control made its first call to Ms. Fletcher on her cell phone from 866-383-9209 on August 18, 2017 at 9:25 a.m.   Ms. Fletcher did not answer this call, but instead called the number back and was told the company was Firstmark.

114.   Credit control called a second time on August 18 at 10:40a.m., but Ms. Fletcher did not answer.

115.   Credit control called a third time on August 21, 2017 at 8:41 a.m. and

23

left an 11 minute voicemail message stating: "This is Credit Control calling with a message. This call is from a debt collector. Please call us at 866-383-9209."

116.   Credit Control did not have Ms. Fletcher's permission to call her on her cell phone.

117.   On information and belief, Credit Control knew it was calling Ms. Fletcher's cell phone.

118.   On information and belief, Credit Control used an automatic dialing device.

119.   On August 22, 2017, Ms. Fletcher picked up the fourth call from Credit Control that originated from 866-383-9209. She asked the agent, Tad Clemons, to stop calling her and instead to communicate with her by mail.

120.   For a while, Credit Control stopped calling.

121.   Meanwhile, Firstmark and Nelnet continued to call.

122.   Between August 18, 2017 and September 1, 2017, Nelnet called Ms. Fletcher eleven times from 888-486-4722.    The calls were at: 10:40 a.m. on August 18; 3:56 p.m. on August 21; 10:11 a.m. on August 22; 10:01 a.m. on August 23; 9:52 a.m. on August 24; 9:00 a.m. on August 25; 2:27 p.m. on August 28; 1:31 p.m. on August 29; 9:37 a.m. on August 30; 9:57 a.m. on August 31; and 9:27 a.m. on September 1.

123.   The calls from Nelnet and Firstmark stopped thereafter.

124.   Credit Control's calls started a few weeks later.   These calls originated from the 866-383-9209 number.

125.   On September 20, 2017, at 8:18 a.m., Credit control called, triggering Ms. Fletcher's voicemail for three seconds.   No voicemail message was left.

126.   On September 29, 2017, at 8:16 a.m. Credit control called and triggered Ms. Fletcher's voicemail for eight seconds.   Again, no message was recorded.

127.   On October 6, 2017 at 2:25 p.m. Credit control called and left a seventeen second voicemail message that said "This is Credit Control calling with a message. This call is from a debt collector. Please call us at 866-383-9209."

128.   On January 15, 2018 at 6:49 p.m., Credit control called and triggered Ms. Fletcher's voicemail for two minutes and fourteen seconds.   No message was left.

129.   No calls occurred thereafter.

## CLAIMS FOR RELIEF

### First Cause of Action against Defendants Firstmark and Nelnet

### Statutory and Actual Damages under the TCPA

130.   Plaintiff reasserts and realleges the paragraphs 1 to 129 as if incorporated herein.

131.   Plaintiff never gave Nelnet permission to call her on her cell phone and orally and in writing rescinded her permission for Defendant Firstmark to call her on six separate occasions.

132.   Defendants Firstmark and Nelnet knew the telephone number Ms. Fletcher gave to Defendant Firstmark prior to her rescission was to a cell phone.

133.   Defendant Firstmark and Defendant Nelnet called Ms. Fletcher's cell phone without her consent at least 69 times between May 4, 2017 and September 1, 2017 in violation of 47 U.S.C. § 227(b)(1)(a)(iii).

134.   The vast majority, if not all of these calls were made by Defendants Firstmark and Nelnet using an automatic dialing system and/or an artificial or pre-recorded voice, as defined in 47 U.S.C. § 227(a)(1).

135.   The automatic dialing system used by Firstmark and Nelnet in the vast majority if not all of these calls consisted of equipment that had the capacity a) to store or produce telephone numbers to be called, using a random or sequential number generator and b) to dial such numbers, as defined in 47 U.S.C. § 227(a)(1).

136.   Ms. Fletcher suffered damages as a result of these calls, including emotional damages, invasion of privacy, and damages of inconvenience, which are recoverable under 47 U.S.C. § 227(b)(3).

137.   All of the calls made by Defendants Firstmark and Nelnet between May 4, 2017 and September 1, 2017 were willful or knowing violations of the TCPA and subject to treble damages under 47 U.S.C. § 227(b)(3).

## Second Cause of Action against Defendant Credit Control

## Statutory and Actual Damages under the TCPA

138.   Plaintiff reasserts and realleges paragraphs 1 to 137 as if fully incorporated herein.

139.   Plaintiff never consented to receiving calls on her cell phone from Defendant Credit Control.

140.   Credit Control made eight calls to Ms. Fletcher's cell phone without her consent between August 2017 and January 2018.

141.   Credit Control used an automatic calling device and/or use of a pre-recorded message when making these calls.

142.   The automatic dialing system used by Credit Control in all or most of its eight calls consisted of equipment that had the capacity a) to store or produce telephone numbers to be called, using a random or sequential number generator and b) to dial such numbers.

143.   Credit Control knew or should have known the number it was calling was a cell phone number.

144.   Ms. Fletcher suffered damages as a result of these calls, including emotional damages and damages of inconvenience.

145.   Ms. Fletcher told Defendant Credit Control to stop calling.

146.   The five calls made by Defendant Credit Control after she told it to stop calling were willful or knowing violations of the TCPA and subject to treble damages under 47 U.S.C. § 227(b)(3).


**Third Cause of Action against Defendant Firstmark**

**Statutory and Actual Damages under New York's Consumer Protection Law**

147.   Plaintiff reasserts and realleges paragraphs 1 to 146 as if fully incorporated herein.

148.   New York prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state

. . . ." New York General Business Law § 349(a).

149.    Defendant Firstmark has used deceptive consumer-oriented acts and practices in the conduct of its business.

150.    Defendant Firstmark "conducted a business" and/or "furnished a service" as those terms are defined in GBL § 349.

151.    Defendant Firstmark's deceptive acts and practices include the following two step act and practice: first, Firstmark told Ms. Fletcher that she was free to ignore its harassing phone calls if she had no new information to give; second, when Ms. Fletcher followed this advice and stopped answering Firstmark's call, Firstmark used her behavior to justify calling her brother under the pretext that it could no longer contact her.

152.    As a result of the actions of Defendant Firstmark, a reasonable consumer would have been led to believe, as Ms. Fletcher did, that she could ignore Firstmark's harassing calls without triggering even more harassing debt collection activity.   In fact, by following Firstmark's deceptive advice, she triggered greater pressure in the form of a call to her brother regarding her student loan debt.

153.    Defendant Firstmark's deceptive action of calling Ms. Fletcher's brother caused Ms. Fletcher to sustain actual damages including emotional

harm.

154.     Ms. Fletcher is entitled to an injunction barring Defendants from engaging in such deceptive acts and practices, and to recover actual damages and/or statutory damages, costs and attorney's fees.

**Fourth Cause of Action against Defendant Nelnet**

**Statutory and Actual Damages under New York's Consumer Protection Law**

155.     Plaintiff reasserts and realleges paragraphs 1 to 154 as if fully incorporated herein.

156.     New York prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ." New York General Business Law § 349(a).

157.     Defendant Nelnet has used deceptive consumer-oriented acts and practices in the conduct of its business.

158.     Defendant Nelnet "conducted a business" and/or "furnished a service" as those terms are defined in GBL § 349.

159.     Defendant Nelnet's deceptive practices and acts included switching autodialed calls from Firstmark's numbers to its own auto dialer in late July 2017 to avoid honoring Ms. Fletcher's July, 23 2017 cease and desist letter to Firstmark that Nelnet had scanned into its computer system.

160.     As a result of the actions of Defendant Nelnet, a reasonable consumer would have been led to believe, as Ms. Fletcher did, that the call concerned a matter other than her student loan debt and hence was worthy of answering.

161.     Defendant Nelnet's deceptive actions, which resulted in Nelnet making additional calls to Ms. Fletcher' cell phone using an auto dialer, caused actual damages including emotional harm.

162.     Ms. Fletcher is entitled to an injunction barring Defendants from engaging in such deceptive acts and practices, and to recover actual damages and/or statutory damages, costs and attorney's fees.

## DEMAND FOR JURY TRIAL

163.      In accordance with Fed. R. Civ. P. § 38(b), Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Assume jurisdiction over this matter;

2.    Enjoin Defendants from violating the TCPA by making calls to Ms. Fletcher in the future.

3.    Order Defendants Firstmark and Nelnet to utilize procedures that ensure the timely cessation of telephone calls when consumers ask orally or in writing that calls cease.

4.    Enter a declaratory judgment that Defendants violated the TCPA by making unauthorized calls to Ms. Fletcher;

5.    Award Ms. Fletcher $500 for each call Defendants made in violation of the TCPA and $1,500 for each call that was made after Ms. Fletcher asked defendants to stop calling her, or her actual damages, whichever is higher.

6.    Declare that Defendant Firstmark and Defendant Nelnet violated NY GBL §  349;

7.    Award compensatory and statutory damages under NY GBL § 349;

8.    Enjoin further illegal conduct under NY GBL § 349;

9.    Award attorney's fees under NY GBL § 349; and

10.    Award such other and further relief as this Court deems just and proper.

Dated:    June 25, 2018
            Brooklyn, New York

By:     ____-s-__Johnson M. Tyler_
        JOHNSON M. TYLER
        DANIEL BARKLEY
        Brooklyn Legal Services
        105 Court Street
        Brooklyn, NY 11201
        Attorneys for Plaintiffs
        (718) 237-5500